It's like the next case on the call is, uh, let me double check here, Finley v. Marlen, 513-346. Counselor ready?  Good afternoon, may it please the court, counsel. My name is Matt Marlen, I represent the defendants, appellants in this matter. Unlike many appeals that you have in this court, I think this one is relatively straightforward, as there's really no significant dispute with regard to the material facts of the case. And before delving into those facts, I would like to address the standard review before this court. Although in my brief I indicated that the standard review in a bench trial is where the judgment is against the manifest weight of the evidence, I believe that the applicable standard review is de novo for the trial court's conclusions of law as the material facts are not in dispute. And just for a little bit further clarity, there are two sections to my argument, Issue 1 and Issue 2. Issue 1 is the issue that addresses adverse possession. That's where I indicated that I thought the standard review was against the manifest weight of the evidence. In Issue 2, which had to do with a petition or substitution or change of all associate judges in Madison County, this is the standard that I cited being de novo. And I do cite a case for that proposition. That's the Kaiser case in my brief. It's a case from this court from 2010 citing the Corral case, which is an Illinois Supreme Court case from 2005. The two issues that I'm going to argue can be summarized as follows. Issue 1, whether the affirmative defense of permissive use defeats the plaintiff's claim for adverse possession. And Issue 2, whether the defendant's appellant's petition for substitution and change of venue or transfer to another county should have been granted when the plaintiff's counsel is married to a sitting circuit judge who has the power of appointment over associate judges, including the trial court, especially in a bench trial where the judge is the finder of fact. Starting with Issue 1, the law in Illinois provides, in order to establish title under adverse possession, there must be certain elements that are met, and they have to be 20 years of continuous, uninterrupted activity. I'm not going to go through those elements. The one that I'm focusing on is adverse or hostile. I am not contesting the court's determination that the other elements were met. Further, all presumptions are in favor of the title owner, which would be the defendants in this case, and the burden of proof is upon the adverse possessor that requires each element be proved by clear and unequivocal evidence. The law of adverse possession and its defenses are pretty well settled in the state. They go back many, many, many years. Permission and or permissive use is a defense to adverse possession as the hostile or adverse element cannot be satisfied. That's the Davidson case that I cited in my writing. Another case states that a party cannot prevail in a claim for adverse possession when its use is permissive. This is the Mann case. It's a 1990 case out of the First District. The White v. Stewart case, again, cited in my brief, states that if it can be shown that the use has been made pursuant to the permission of the owner of the serving estate, it cannot be classified as being adverse. Such permission may be established by a written or oral license or may be inferred from the surrounding circumstances. Before delving further into the argument, I'm going to use several names interchangeably. The defendants bought the property in approximately 2006. Their predecessor in interest, the immediate predecessor of interest, was a gentleman by the name of Peter Bostrom, and I will make reference to the Bostrom Farm, which is currently owned by the defendants. And prior to Bostrom, Bostrom owned the property from 1987 to 2006. Prior to Bostrom, Strife, a gentleman, owned the property from 1974 to 1987. The defendants bought their property in approximately 1982, bond for deed, and I think it was around 1991, 1992 that they actually took title to their property. Now, in this particular case, there was no written permission between the parties or their predecessors in interest. But there are several instances in which the plaintiff's permissive use of the defendant's farm can be inferred from the circumstances. And this is as testified to by the plaintiffs themselves. I'm going to go through six instances. The first instance is when the plaintiffs testified that Peter Bostrom, defendant's predecessor in interest, expressed to them that it was okay for them, being the plaintiffs, to enter upon his property. And again, to put this in context, the plaintiffs owned approximately four acres adjoining a farm that is approximately 80 to 90 acres. The second instance, Plaintiff John Finley testified that he removed debris from the defendant's farm field when the creek overflowed. Now, Plaintiff Finley did this when Pete Bostrom owned the property. And he testified that he did this to assist his wife's father and her brother. And these individuals actually farmed Peter Bostrom's farm the whole time that he owned it. The third instance, plaintiffs and their family members would take walks upon the defendant's farm while Pete Bostrom owned it. The fourth instance is when Plaintiff John Finley testified that he chased trespassers off of the Bostrom farm on several occasions because Bostrom was an absentee landlord and they wanted to help him out. Now, before I mention the fifth example, I think this is one of the more important examples because it demonstrates the level of cooperation and permission that existed between the plaintiff's family and Pete Bostrom when he owned the property. The fifth instance is when Peter Bostrom testified that he and Clarence Mersinger, who was Plaintiff Kathy Finley's father, and he farmed Peter Bostrom's farm. They filled in a well together near an old house on Bostrom's property so that the plaintiff's kids would not fall in it. I think this demonstrates that obviously Peter Bostrom knew that the plaintiff's kids were playing on his property, that he didn't have a problem with it, that in fact he and Clarence Mersinger, his tent farmer, who is the father of Kathy Finley, filled in this well together so that the kids would not be harmed. And the sixth example, and I think this is the most important one, is when the plaintiffs admitted that they had implicit permission to use the defendant's property when it was owned by the defendant's predecessors in interest. This is their own testimony. The defendant's predecessors in interest from whom the plaintiffs had implicit permission was Strife and Bostrom, who collectively owned the property from 1974 to 2006. And I think you know where I'm going with this. If the plaintiff's use of the property was permissive from 1982 to 2006, the claim for adverse possession fails as the hostile or adverse element has not been met for 20 continuous years. Now, with respect to the trial court's written judgment of March 19, 2013, there is no mention of the plaintiff's permissive use of the property. And I can't speak for the trial court. I don't know what the trial court was thinking, but one guess on my part would be perhaps it was not aware that permissive use trumps all adverse possession claims, even in mistaken boundary cases. Now, one argument that the plaintiffs were likely to make is that the permissive use of the Bostrom property was only the farmland and not the grave arbor that they sectioned off and planted graves in. And I think this is refuted in two points. The first point is that the plaintiff's admission of permissive use of the Bostrom property does not exclude the grave arbor. They testified they had implicit permission to use Peter Bostrom's property. The second instance is when the plaintiffs testified that they believed Bostrom wanted them to watch over his farm as he was an absentee owner who did not reside on this property. It is inconsistent for the plaintiffs to testify that they were protecting Bostrom's interests on one hand, watching over the farm, while claiming the fruits of adverse possession on the other. Frankly, these two positions are inconsistent and do not satisfy the clear and unequivocal burden of proof required to establish an adverse possession claim. And I would add further, whether the plaintiffs used, marked, fenced, or otherwise enclosed the disputed tract known as the grave arbor is not material as they had permission to use all of the Bostrom property, including the grave arbor. I'll move on to the second issue now. The second issue concerns the propriety of an associate judge. Before you leave that first issue, was there any testimony that they got permission to put that grave arbor there? I mean, it wasn't specific to the grave arbor, was it? They did not receive permission, to the best of my knowledge. And their permission for use, or to go on your client's or the predecessor's property, was it for specific uses? I'm just trying to recall, picking up corn, or were there some other specifics, you can go on the property for this purpose? Peter Bostrom testified in Plaintiff's case in chief that he didn't care how they used the property as long as they didn't hunt arrowheads on it, because he liked to hunt arrowheads. Other than that, they basically had free reign of the farm. And there was nothing to the contrary in the plaintiff's testimony themselves. There was no limitation with regard to their admission that they had implicit permission, and those were their words, to use those woods. So is this tillable ground? Is there crops being grown on this property? Yes, Your Honor. So they had free use of the farm, but they couldn't grow crops. They could walk on it or use it for recreation or whatever, I take it. Yes, sir. Okay. Issue number two. And this is an unusual point, but this concerns the propriety of an associate judge ruling in a bench trial when the plaintiff's attorney is married to a sitting circuit judge in the same county and who has the power of reappointment over the trial court. I did file a petition for substitution and change of venue back in January 5th of 2012, and I sought the substitution of all the associate judges in Madison County and a transfer to another county, not on the basis of any actual bias or prejudice, but rather due to the marital relationship between the plaintiff's counsel and the circuit judge. This marital relationship potentially has the power for an associate judge, the trial court, for example, to consider the possible consequences of not being reappointed when potentially ruling against a plaintiff's attorney and thereby creating an inherent or a structural conflict of interest that I allege requires the recusal of all associate judges. As you can guess, my motion was not exactly warmly greeted by the trial court, and it was denied as the trial court believed I was required to show actual prejudice, which I acknowledged that I couldn't and I didn't even allege. I've been practicing for a little while now, certainly not as long as the justices, but this is the first time I've encountered a situation like this. It's obviously a very narrow issue. I've been through the code of judicial conduct. I've been through the Supreme Court rules. I've been through the rules of professional conduct, and I can't find anywhere that really is even close to this type of situation. The one case that I did find that is, and I'll admit, very tangential to this issue is the Ferris v. Ferris case, and that's a Second District case I believe from 1986 that cited Maurice as well. And in this case, the wife had filed a petition for dissolution, and prior to, at some point, her ex-husband, who was an attorney, was appointed to the bench. And she filed a motion for change of venue from all judges in that circuit on the basis that, again, her soon-to-be ex-husband had been a present attorney and had been appointed as associate judge. This was only one of several issues that were appealed by the wife, and the appellate court affirmed the trial court's denial of the wife's change of venue petition. And here's the reason I bring this case up. The appellate court wrote in dicta that the associate judges of the circuit, including the trial judge, do not vote on the appointment of an associate judge. This sentence seems to suggest that if the trial court had voted on the appointment to the bench of the former husband, that it may have been potentially sufficient prejudice for the appellate court to entertain the wife's petition for recusal of all judges. That's utter speculation on my part, but I presume they put that sentence in there for a reason. I acknowledge that this statement is culled from a lengthy opinion, but I believe it does lend some credence to the defendant's concern that a change of venue may be appropriate where there is some inherent or structural conflict of interest present, especially with the finer effect. What district is that from? That is the 2nd District, Your Honor. So, in conclusion, I would ask that this court reverse the judgment of the trial court. Thank you, guys. May it please the court, my name is Larry Taliana. I represent the appellees in this case, John and Kathleen Finley. I'd like to start off addressing some of the arguments made by Appellant's counsel because I don't think he's given the complete picture. And just to set the background a little bit, the reason for the discrepancy in the legal descriptions, if you care to wade through the recorded documents and the testimony, what happened is the original owner of this disputed parcel sold in contractor D to my clients. It was about an 800 foot strip. The actual legal description by an attorney or a surveyor went to the middle of the road, which was right next to the piece of property. The parties in the original seller's name was Bugger, and that's the way it was pronounced, measured it from the edge of the road. So when it was measured out, when the parties dealt with it, they were 40 feet east of where the legal description technically was. So this 40 foot section that my client was buying is what we have called the grape arbor, because it was always a grape arbor from the very beginning. The seller of the property, who was the predecessor to Mr. Bostrom and the predecessor to the appellees here, when they pointed out this property, he told my clients, you own this, this grape arbor. We have the testimony of my client that for the entire time he believed he owned the property. They utilized the grape arbor, they picked the grapes, they were the only ones who exercised control over it. Mr. Bostrom, the gentleman that was just referred to, acquired the property from Bugger. He testified, and if you review the testimony, you'll see that he said he never treated that grape arbor as if it was his. He never asserted that he owned it, that it was his. He never did anything to assert any type of control, and he also testified in his testimony that it never would have occurred to him. If at any stage prior to the survey that was later performed, if you had asked Mr. Bostrom who owned that grape arbor, he would have said my client. My clients never at any time were aware that someone else might be able to assert a claim. Now, if you'll review Mr. Bostrom's testimony, he testified that the Finleys would go on occasional walks on his property. He said it was okay for the Finleys to walk on his property, but he also had said it wasn't okay for them necessarily to use the property in whatever way they desired. This was not an unlimited use of all of the property. So I think the problem here, and where I disagree with counsel for the appellants, one of the elements of adverse possession is adversity. I mean, naturally, that's in the title. But the Illinois Supreme Court in Joyner v. Jansen, which is cited in my brief, says that hostile and adverse doesn't mean ill will, at least not in this context. You can maintain an adverse possession claim against someone you like, against someone you get along with. What the adversity or hostility means is an assertion of ownership incompatible with that of the true owner, and that's from the case. But there was never any doubt who was asserting ownership of the property. The Finleys were. Mr. Finley testified, and there was no contradiction, that he believed he owned that property from the very beginning. When he and the seller walked it off, they measured it from the edge of the road rather than the middle of the road, which an attorney would have done. So one of the predecessors, for part of the time period, affirmatively told my client he owned this property. Then it went to Bostrom, who said he never exercised any control over it. He never tried to say that he was the owner of it. He said it wouldn't have occurred to him. And if you care to, I mean, it is pretty illustrative to read Mr. Bostrom's testimony. It's only about 15 pages of the record. But it is not at all similar, in my opinion, to the assertion that the Finleys had carte blanche to just go wherever they wanted on Bostrom's property. Even if they had that permission on all the rest of the property, for the property here, both Mr. Bostrom and my clients acted and behaved and believed that my clients were the owners. So that is adverse within the nature or within the meaning of the adverse possession requirements. So I believe that it was very clear that my clients met all of these. I don't believe it was the situation where somehow the trial court overlooked that Bostrom and the Finleys got along. That my client could walk on his property, although didn't have freedom to do whatever they wanted. Now, that doesn't rise to the level of a permissive use. And I would have to say that had the court ruled the other way, I would have felt justified in appealing. But to the extent that there are different inferences that could be drawn from the testimony, obviously my position is that the court was well within its discretion in entering the order that it did. To the extent that, if you recall, there was a specific mention of permissiveness. But I believe that the court didn't view any of this as rising to the level of a permissive use. When both parties, the Bostroms and the Finleys, believe that the Finleys owned this disputed area. I do want to mention the other thing with respect to whether the judge should have recused himself. I believe judges have had family, friends, and business acquaintances ever since there have been judges. They don't round up judges from some kind of isolated corner of the county with people who don't know anybody else or have any connection. There have been institutional settings and there has been jurisprudence that has dealt with this. Circuit judges are elected.  The setup is at least in part an effort to minimize any one relationship affecting the judge's conduct. To the extent that someone believes there may be a specific problem. That Ferris case I think is an excellent discussion of the issue. I read it too and of course what I see in it supports what the judge did in this case. If you believe that there is a problem, you have to make a specific factual allegation of what you think the problem is. If you look at what happened here, appellant said he wasn't alleging anything specific. It was addressed to the inherent nature of the conflict when an attorney is married to a circuit judge. A per se situation is what you're trying to say. That's what it looks to me like he's arguing. He says he doesn't have any specific facts. It's going to the inherent conflict. So yeah, I think he's saying it was a per se situation. Judges know people. Judges have family. You can't just create an inherent conflict because there's some connection. Particularly if you go back further in the history of the state, when towns were smaller and everybody knew everybody else. Everybody had family. I think the right way to do it is the way the court described here. You make a factual allegation. In Ferris it says when you're trying to excuse a whole group of judges, you've got to be factual about what the problem is. Everybody knows I'm married to Barb Crowder, at least in the circuit. Although I do want to be fair to opposing counsel. I thought everybody knew in my county that I was married to Barb. He didn't know right off the bat, which is one of the reasons I think there was a delay. I didn't protest. It never occurred to me to say, oh, I'm married to a judge here. He didn't find out until a little bit later in the case. Anyway, once the factual allegations are made, then it's addressed to the discretion of the court. And Judge Stobbs here knew about me being married to Judge Crowder. But there was no connection between the clients here and the judge. This was a motion for cause, a substitution for cause, as opposed to as a matter of right. And the appellate included in the appendix the transcript of the hearing that Judge Stobbs had on this motion. And as my recollection was, he said, you haven't used your matter of right strike yet. You can still use that. And that was not done in this case after he ruled on the motion for cause. Does that make any difference to anything? I haven't thought about it. I'm going to ask on rebuttal the same question Mr. Barber has. He didn't think about it. He didn't find out until later in the case that I was married to Judge Crowder. There was a period of time after that. I don't know, going back and reviewing the time periods, whether that would be a factor. But obviously, the motion had been raised. My thought was, yes, he did find out. He filed a motion for cause and said, the judge is going to be prejudiced against me because your wife votes on my retention. But then was offered the opportunity, if he thought he was prejudiced, to use his strike as a matter of right so that another judge would be allowed to hear it. And I don't know if that means by not filing a motion as a matter of right, if you're somehow waiving or stop them from saying, well, I was prejudiced. At no stage did he try to do the substitution to judge. Well, he would have had to do that before the motion for the cause, wouldn't he? Possibly. Although Judge Stobbs, in the record, he said, I'm not ruling as a substantial issue here. Would you let the door open if you wanted another judge? Well, actually, now that I think about it, he was challenging all the associate judges. So a substitution of judge wouldn't have made any difference. He was saying, Judge Stobbs, I don't want you to hear it, and I don't want any other associate judge to hear it. So I don't think he could have brought a substitution of judge and sought the same relief that he was seeking with the change of venue. Now that I've played it through my head, it didn't seem to be that at any time he was seeking to get rid of one associate judge. And he says he's not alleging any particular bias or prejudice. He said that in the original motion. So with that, I don't think a substitution of judge was another way of seeking the same relief. And that's not what he wanted. He wanted to challenge all the associate judges. And that's the relief that he's asking for here. Was there any inquiry on the record as to, I mean, you've been a practicing attorney for a long time. Was there any inquiry on the record or by discovery as to the number of cases you may have lost in front of associate judges in Madison County? Oh, I hope not, because that would take a long time to compile. There was no inquiry in this case as to that? No, and somehow I have a perfect record in front of the associate judges. You have lost cases in front of the associate judges? More than I can count. Once again, he didn't allege any actual bias or prejudice. We didn't get into any specifics. He said it was the inherent conflict with me being married to someone who could vote on the retention of the associate judge. And I'm saying that this inherent conflict is not something that is the reason in jurisprudence here that goes to that. You need more than just showing the relationship between an attorney and a circuit judge. Like I said, if you started breaking down everybody who sits on the circuit court bench in Madison County, almost all of them have a relative somewhere in the legal system. So if you started doing that in every county, maybe you could set up a system where you bus associate judges from one county to another to take care of these types of cases. But that's just simply not the way the law is developed. So I believe that in terms of law, in terms of the actual testimony here, going back to the big picture, that the court at all stages exercised appropriate discretion given the law and given the testimony that they heard. I believe the court's order was entirely appropriate. Thank you. Thank you, counsel. Rebuttal. Thank you. Let me clarify one thing that counsel stated. Factually, counsel indicated that Peter Bostrom bought the farm from the Boogers, and that's actually not correct. He missed a landowner who was Strife. Strife bought the farm in 1974. Let me just back up a little further. The Boogers owned them. They were the common owners of both of these tracts. In 1974, they subbed off the farmland, sold it to Strife. Strife ended up selling it to Bostrom in 1987, 1986, 1987. The plaintiff's end of the picture in 1982. Why is that significant? If plaintiff was pursuing reformation, that would certainly be relevant. I don't think it's too relevant today. If he's trying to claim some type of deed reformation, which he had pled in his complaint the day of trial, then there would be an issue because you can't reform a deed if it's not against the former owner. In other words, Bostrom and my clients were bona fide purchasers for value, and were not aware, didn't have notice of the alleged defect. So, I'm not sure that's really material. And Justice Schwarm, with regard to your point, I think counsel answered in my stead very eloquently that it didn't solve, doing a substitution of one judge would not have solved the problem. I would have been right back in the same place. And I didn't think, I didn't think Judge Stobbs, I didn't think he was biased or prejudiced. To any extent that I would use my one bullet, I think he's a fair judge. I'll say it on the record. Going back to this permissive use issue for adverse possession, I've hammered this in my brief, I'm going to hammer it here, that the plaintiffs admitted they had implicit permission. Counsel wants to distinguish, well, you know, they, Bostrom didn't know he owned the Great Harbor because there was a difference in measuring and the plaintiffs had, you know, planted some grapes there. I'm not really sure that that matters a whole lot. It matters in terms of him making his prima facie case, but the affirmative defense of permissive use trumps the hostile or adverse element in his claim. And here's an example. Let's assume that, let's assume a landlord rents to a tenant for 20 years. And on day one, that tenant comes in and fences in the yard without the landlord's consent. And after 20 years, then the tenant says, ah, it's mine, and files a claim for adverse possession. If counsel's position is to be believed, then the tenant would be the owner of the property. Even though the tenant had permission, the tenant came in, fenced it, and used it contrary to the wishes of the landlord. But that's not what the law is. Permissive use trumps the tenant's claim of adverse possession. It can't be hostile if it's permissive use. That's the bottom line. And I think that's what the trial court missed in this particular case. Thank you, counsel. Thank you, Robert. This will be taken under advisement. You'll be advised.